Mr. Darst. Thank you, Your Honor, and may it please the Court. The order granting summary judgment in this case did not consider the evidence that Thermo Fisher hired Mr. Abebe at a lower position than he had held at Lilly, whereas he had held the manager position at Lilly and worked for 15 years there, was an excellent employee. You need to speak up, Mr. Darst, please. Oh, thank you very much. And yet Thermo Fisher hired the white managers and manager positions. So at that point in time, Mr. Abebe was discriminated against and he complained to Thermo Fisher. Thermo Fisher said to him, I tried to placate him and say, there will be other opportunities later. So he watched for other opportunities later and instead he found that Thermo Fisher was grooming the white employees, not promoting him, and then after grooming the white employees, was placing them in supervisory and manager positions. For example, white employee Michelle Dias was placed in an interim position. Mr. Abebe, of course, was not in management and did not know exactly what happened there, but we know now after the lawsuit that Thermo Fisher placed her in an interim position without any posting and then after placing her in the supervisory position without any posting, without Mr. Abebe being able to apply, then promoted her to the permanent position of supervisor over him and she been below him and was working at a much lower salary. Mr. Abebe's salary indicated his years of experience, his good work, and his education. He had a salary of over $90,000. Could I ask you, I realize you're probably trying to do this, but to focus on how these experiences, you're quite right, the quite some number of promotions and he doesn't get them. His salary remains a good salary, but I'm going to assume for the time being that not getting a supervisory position is its own kind of independent harm, even if your salary isn't affected. But we need to link these things to the kinds of discrimination that you're charging. So the company has said in virtually all of these instances that the candidates that it selected were more qualified. The jobs were all different, the qualifications were a little bit different, but how do we overcome, how do we show that that's pretextual or that that's simply not an The facts that I've set out, those facts on my face show that he was more qualified and that he held that position at Lilly and had held other supervisory positions at Lilly in that area, team leader and manager, and yet when he, when those positions were transferred to Thermo Fisher, they did not place him in the manager position as they did with the white employees, the other white treatment of Mr. Baby right at the beginning, and then when he complained about it, well, he then, he complained about it and they said other, there will be other opportunities. Then Thermo Fisher started grooming the white employees without giving him any grooming or without recognizing his superior experience. So let me give you an example, not to make your argument for you, but it, this court has been very reluctant to second-guess employers about the question whether A is more qualified for a job than B without some pretty egregious facts, but I'll take the October 2013 incident where the question is whether somebody has this PPI experience and the stated reason is that Mr. Abebe didn't have it and you have suggested that that's inconsistent with the record, that he in fact had gotten that 2011 year-end review where he's getting at least a standard mark for embraces PPI and that there's other evidence in the record too. So if you can show we were looking for PPI experience, you didn't have any Mr. Abebe, and yet Mr. Abebe had it, that's the kind of thing that you kind of get your hands on. Thank you. That's what I'm looking for, you know, more generally. Yes, and that's why we drafted the summary of the brief, which was submitted as a rule 1006 summary used as substantive evidence because it is very difficult to go through resumes and years of the denials of promotion or placement or any position at all. But this is a little bewildered, I mean, you know, this summary, you know, just sort of tells you that these various people have, you know, it's apples and oranges, right, they have different kinds of qualifications and the company picks who it picks. Well, I believe you're mentioning on October 13, excuse me, October 2013, on appendix page 46, I think you're talking about the selection of Thomas Turner. I am, yes. And so that's why the evidence, previous evidence, that the court ignored is so important. And this case is about the court ignoring evidence, which it cannot do, especially after the Ortiz decision. So that's the important thing about the case. The court cannot ignore the evidence, and yet in this case the court ignored wide areas of evidence, in particular the evidence from 2010 to 2013, right before this selection, in which Thermal Fisher not only selected, groomed and selected Michelle Dias, but also groomed and selected the white employee Tom Turner, who worked under Mr. Abebe at Lilly and had, did not have the minimum, even the minimum, five years of experience when he was promoted to manager by Thermal Fisher. So, Mr., you've mentioned, well, the way, one of the ways that Thermal Fisher groomed Mr. Turner was to give him a temporary project, a PPI. Right, so he winds up having the Thermal Fisher PPI experience, right, that they're looking for in this October 2013. Well, the PPI is nothing in particular to Thermal Fisher. PPI is done in every one of these areas at every employer. And so Mr. Abebe had done PPI, which is practical process improvement, for many years as he was the team lead, and then the manager, and then a part of the company-wide audit committee, which is a very important position, as you can understand. And so Thermal Fisher is not only grooming the white employees, but then saying, we're promoting them because we groom them. And the court said, well, you know, we don't see any grooming. Well, that's because the court said, we're going to ignore all of the evidence between 2010 and 2013. That's why it's very important not to ignore the evidence, which Ortiz laid out. So before your time expires, I would like you to say a word about his retaliation claim, because I take it he did get the first retention bonus up to March 31st, 2015, but then it was the second one, the second extension to October, that they decide they want the release for? Correct. Why is it so suspicious to be asking for a release? How many people were involved in that second extension? Approximately, I think, nine in his area. Nine in his area. So he's one of nine. Correct. So is it your theory that they knew that he was the only one of the nine who actually had ongoing anything, you know, that needed to be released, let's say? Certainly. As a matter of fact, that thing that they knew about was his lawsuit. Right, three weeks earlier he had filed the suit. Exactly, and the court got it backwards and said in the order that he rejected the severance bonus and then filed his lawsuit, which is not correct. But the sequence is wrong. He files the to sign this release, he won't sign it, and so he's let go without the second extension. Exactly, and furthermore, combining a severance agreement with a retention bonus did not make any sense. They were contrary. Now I can go back to the retaliation in 2012, which is important, which the court ignored. It's in that area that the court ignored. He complained at the end of 2011 of shortly after that, Thermo Fisher told Thomas Turner, his supervisor, to change his ratings and lower his ratings that had already been given him, which was changing them was a false action and a lie. And then Thomas Turner had just before that written the email complimenting him, which is Appendix 50, saying that he... Right, I remember it. It's a nice email. Right, well he was calm and professional while others were anxious, whereas Thermo Fisher now says as some of their qualifications, some of the reasons for selection, well we wanted people because they were excited. Well young people are going to be excited, mature people are not going to be excited. Please, Mr. Dorst, I can't believe you're suggesting that mature people don't get excited. Well the evidence says that he was very calm and professional. All right. The evidence is that others were nervous, anxious, and doing things out of line. And so Thermo Fisher ignored that and told Thomas Turner, who had just written this, to lower a baby's ratings. And then Thermo Fisher told a baby, we're going to put you in a PIP, and he said this is totally... Are PIPs worse than the other thing he got, the coaching plans? A coaching plan appears to be an attempt for them to back off a little bit, because he said this is totally discriminatory. And they said, okay, we'll put you in a coaching plan. So some kind of intermediate step. But it had the same effect. It prevented him from applying for any other position. He then had to take leave because he was so upset. He filed an EEOC charge, and within two months, when he came back, they said, well, we're not going to change anything. You're still in a coaching plan. We're going to extend it. But you can quit, and we'll give you a severance bonus of two months. At that point, he could have kept his job, kept his EEOC charge, which he did, and continued working. That didn't satisfy Thermo Fisher in getting rid of him. So then in 2015, after he filed his lawsuit, they didn't say, you can stay in the same position, continue your employment, and continue your charge or your lawsuit. They said they attached a severance. But there was a sunset on it. I mean, this is at the time when Lilly was reabsorbing these jobs, right? But he could have worked for three more months. Right. He could have worked for a while longer. He tried to find other work in the company so that he would be permanent. And then they extended it two more months. So he could have gotten two more retention bonuses, and had the salary, and had the opportunity to get other jobs. But they said, if you don't drop your lawsuit, we're going to terminate you. And they did. And they did. So, which you can't do. An employer cannot say, if you don't drop your discrimination charge or lawsuit, we're going to terminate you. That's just totally, on his face, retaliatory. And it doesn't make any sense, because they were trying to keep employees, not terminate them. So a severance agreement is only proper at the end of the work, at the end of the three months, or the end of the five months, at the end of the work. You don't, you never say, I'm going to terminate you if you don't drop your EEOC charge, or your lawsuit in this case, which is just blatant discrimination. Okay, you can save the rest of your time, if you like. Thank you. Mr. Montgomery. Good morning. Good morning. You're still in the morning. I'm happy to discuss any of the individual, I have my chart on any of the individual positions. I want to step back for a minute and make some general comments about the merits of the case. And I think that we have to realize here, that we're talking about, at least Mr. Darst is trying to talk about a five-year period of time. These are separate employers. I mean, Lilly got out of the business and wanted Thermo Fisher to take over in 2010. And after, I believe, three EEOC charges, all of the litigation connected with this case, depositions, exchange of emails, etc., there's no direct evidence of discrimination. There's no even stray remarks related to Okay, it's not as if this one person keeps making decisions as to Mr. Beebe's career. And with respect to each and every one of these individual decisions, Thermo Fisher put forward admissible evidence of exactly why the decision was made. And it included performance in interviews that was documented in qualifications and experience. And both of those are perfectly lawful considerations in this circuit and in just about every circuit. So why couldn't a jury look at the pattern, though? I mean, just instance after instance, he applies for some kind of supervisory position. And each time, he's not chosen. And there's also this question that he raises that the evidence from the earlier periods could be viewed by somebody as grooming people to take over. I mean, if you give people a break, like Mr. Turner, you know, who's fairly young, I think back in the 2011 period, then by the time 2013 comes along, maybe he really does have more of this relevant experience. But why couldn't Trier effect see that somehow we'll believe you on one, we'll believe you on two, by the time you get six or seven, or you can't even remember how many instances there are, but it's quite a number. He applies a lot. Well, they are, as I said, Judge, they are individual decisions made by individual decision makers and justified. And by the way, not that many of them are management positions. I mean, some of them even have management titles, but they're not management positions. They all paid less than Mr. Beebe was making. And you'll see that on many of them... Now, is it clear that he would have been paid less, though? Because I thought that the pay and the job title, particularly for these people who had migrated over from Lilly, weren't tightly linked together. He was given, because of his pay at Lilly, he was given a concession where he was paid more than people that were brought into the roles. But in each and every case, and we detail this in the brief and it's in the decision, the individual who received it was paid less than he was. And they were not all management positions. And also, by the way, this is a... This idea of grooming is attorney argument. It's not... There's not factual evidence that supports that where it says, hey, the company went out of its way to bring this person into some particular training and that Mr. Beebe applied for and did not get it. There's not support for this idea. This is attorney argument as to how people got to different positions. And the other thing that's very important about this, you brought up this one position about process improvement. And the same thing is done with this idea of supply chain. I mean, you could say the process... And I think Mr. Garst is admitting it. Process improvement is a general term. We could all say we're involved in process improvement. What they said they were looking for, and it's undisputed, is that somebody that was directly involved in quote-unquote process improvement, which was a Thermo Fisher plan that had Thermo Fisher training that Mr. Turner not only had, but I believe he was some sort of a captain or team lead in that particular aspect. And Mr. Garst is going back and looking at his resume and said, well, hey, well, wait a minute. Back here, this is sort of process improvement without quotes around it, or this is a process improvement. And that's not what they were looking for. And the supply chain piece is even worse because, again, you could also say, hey, I had some involvement in any manufacturing. I had some involvement with the supply chain in general. But that argument that he had supply chain wasn't even made to the district court. I pulled the page out because I think this is important. If you look at page 13 of his, Mr. Garst's brief to the district court, what he really argues is not that Mr. Abebe had supply chain, it's that when the decision-maker looked at Mr. Abebe's 10-page resume, that there was no supply chain experience even indicated in 10 full pages. It wasn't even mentioned. So now in the Court of Appeals, again, it's attorney argument to say, well, wait, I went back and looked at his resume and there's an article here that might relate to this, there's an article there that may relate to this. So I, and we cited it in the brief, and I think it was also in the motion, that there was also cases in this circuit where there are many different positions that people applied for. And part of it is, and I think Mr. Garst is admitting it, that Mr. Abebe just assumed, I have these credentials, I have this longtime experience with Eli Fisher, but with Eli Lilly, so therefore I should get any position that's available over somebody else. I don't... So, no, I understand your argument. I wonder if you could speak then for a little bit about the retaliation aspect of the claim. You know, he files a lawsuit, three weeks later he's told you have to sign a release, there was no release requirement for the first extension bonus, so this was a change, and the timing is funny. Why doesn't, why can't a rational trier of fact see that as evidence that he is, who's the only one of these nine or so people, whatever the number is, who has pending charges, why couldn't they see that as retaliatory? First of all, there is no timing. Well, there was 24 or 25, not nine, I think Mr. Garst purposely pointed to this particular area. There's 24 or 25 people that were impacted by this. Who were subject to the October 2015 extension, or what, if I've got that timing right. Right, and they had already been told that they were going to be terminated as part of this process. So what happened was that they were offered, in connection with the release, an extension of their employment. But that's exactly what had happened before, back when Thermo Fisher thought that the transition process would be over by the end of March, and in that first round there was no requirement to sign a release in order to get extended employment. Well, that's correct, but there had been multiple EEOC charges filed, and by the way, there's nothing in the record that says that none of these other people had zero issues with the company. That is not part of the record. There's not, I don't even think there's anything in the record that talks about their protected classifications or not protected classifications. There's no citation to the record in that, but I... No, and you're right, we have to take the record as it is, no question about that, but what we have is, he has filed all these things and he finally takes the agree. I mean, it's not permissible to retaliate against somebody for filing a lawsuit. Correct. So why couldn't a jury see it that way? Well, Judge, but it is permissible, and this is where I disagree with what Mr. Garcett. It is regular practice for even people that are known individually, to go to individuals that are known to have filed discrimination charges or pursuing litigation, to say I'm going to offer you a severance package, and among other things, offer an extension of their employment. That is not uncommon, and respectfully, I think that it should not be discouraged to do it, and there is case law from this circuit that says that it is not retaliation and not unlawful to do that, which we cited. So it's... So are you seeing this as if there was just only one person involved and the company had said, we see that you filed a lawsuit against us, we'd like to settle the lawsuit, you know, we'll give you this much money, you'll drop your lawsuit? Is that the model that you're using? No, let me make absolutely clear here, Judge, that I'm not saying if you go to somebody out of the blue who has an expectation of continued employment and you just pull them in and say, hey look, sign this or you're out the door. I'm not saying that. What I'm saying is, and this is comparable to the, and I've lost my sight, the Allstate case, the Isabel Allstate case, when it's already been determined that you are going to lose your job on this particular date and somebody comes to you and says, hey look, we got a deal for you. We would like to give you severance benefits and then as part of it also, we would extend your employment for some period of time. That's not uncommon and there's nothing nefarious about doing it. That wasn't even the case here. In this case, it was offered to all 25 of the employees who also may or may not have had issues that they were being asked to relinquish as part of their claim. In the case that he cites is completely an opposite. There's an 11th Circuit case where there's absolutely a directly links the requirement of an arbitration agreement to discriminatory intent and it's cited extensively in the record. I would like to go to one other point which I think is important because I think that this is argued in a way that's not exactly accurate. It's argued as if he was not allowed to bring up these issues that occurred outside the, which are really outside the statute limitations, a period and that he argues it as well, hey my complaint was very strictly construed and the district courts requiring me to mention every single position that I applied for. If you look at these complaints and there's three of them, okay, there's three complaints that he filed and everyone absolutely clear unequivocal language that he's not bringing up issues that occur before that first position which was the October 2013 position. He talks about I applied for that position and I was denied it and thereafter I applied for other positions and I was denied those positions. It was crystal clear that he wasn't focusing on those. He's not making independent claims. I think he was arguing that this is part of the evidentiary background to understand what was happening in 2013 and following. I would point out one other thing on that judge and it's in a footnote in the district courts decision. I believe it was the last footnote but the judge pointed out that the evidence that was no different than the evidence that was offered to in connection with the other ones. It was subjective opinions, no direct evidence, no stray remarks, just subjective opinions that hey because I have these advanced degrees and particular aspects of science and because I worked for Eli Lilly for a long period of time and did a good job, I'm more qualified than anybody else that applies for the position. So she did point out that there really wasn't evidence to support those positions as well. Unless there's other questions, that's all the argument I have. I see none so thank you very much. Thank you. Anything further Mr. Darst? Yes, Your Honor. Thank you. Mr. Abebe did not rely on his subjective opinion. He relied on resumes which were compared in each case with our exhibit in the appendix, relied on the Thermo Fisher documents and exhibits, relied on Thermo Fisher trying to have Tom Turner reduce his ratings, relying on the Thermo Fisher records of placing him, trying to place him in a PIP and when they couldn't or he objected, placing him in a coaching plan, relying on all of those records, relying on the records that show the requirements for the promotions, showing the subjective selection of others just because they said subjective things like, well they were excited. Well of course he'd be excited if they had never held that position. I want to address the retaliation and Mr. Abebe had a particular vulnerability, but it would not have mattered if everyone had a lawsuit. An employer, Thermo Fisher, cannot say we're going to terminate everyone who has a discrimination lawsuit. That's just... Well that's not what happened here though. There was no, as I understand the record, no objective evidence of a continued expectation of employment after March 2015. Yes, Your Honor, there was because they told him that specifically he could remain employed if he gave up his lawsuit. No, I'm talking about before that offer came. At that point, everybody had been notified you're going to be terminated. There was no expectation of continued employment. So this is a condition that's being imposed on something that the employees in this group have no right to expect or no basis to expect would be continued. Yes, because they specifically told him. This is a year later after the first retention agreement, so the second retention agreement that required a They required a release of everybody, so it was a uniform requirement, but why isn't this in the category of discretionary benefits which can be conditioned on a waiver even if there's a pending lawsuit? No, they told them explicitly we're going to hire you if you release your claims. They said we're going to extend your employment for six months. Yes, and a former employee, you can't deny a former employee employment because they filed a lawsuit. So that applies to applicants, former employees, and employees. In this case, he was an employee who was told you'll continue to be employed if you drop your lawsuit. Now, Mr. Thurman Fisher said that, mentioned the Seventh Circuit case of Isley versus Isbell, excuse me, versus State Farm. That was at a time when there was a termination, and they were not going to employ anyone. They were going to treat people as independent contractors, which is not an employment. So that's why there was no violation there. Furthermore, there was no one in that position, the plaintiff in particular, who had a lawsuit or any claim of discrimination pending. Thank you. All right, thank you very much. Thanks to both counsel. Take the case under advisement.